IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                               Case No. 11-CR-2226 RB

JOSE LUIS GONZALEZ-LOPEZ,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** is before the Court on Defendant's ***Motion to Suppress Evidence and Statements*** *(Doc. 23)*, filed September 15, 2011.  The United States filed its response to the motion on September 29, 2011 [*Doc. 24*], and, on September 30, 2011, Defendant filed a notice that he did not intend to file a reply to the United States' response, and requested a hearing on the motion [*Doc. 25*].  On October 18, 2011, United States District Judge Robert C. Brack referred the motion to suppress to the undersigned for a hearing, if necessary, and proposed findings and a recommended disposition.  [*Doc. 33*].  An evidentiary hearing was held on November 7, 2011, at which counsel for both parties were present and presented oral argument.  Defendant was also present.  *See* [*Doc. 46*] (Amended Clerk's Minutes) and [*Doc. 39*] (Transcript).  In addition, on November 30, 2011, both parties submitted proposed findings of fact and conclusions of law to the undersigned.  [*Docs. 43 and 44*].  Having considered the parties' submissions, the evidence

---

[1]**Within fourteen (14) days after a party is served with a copy of these Proposed Findings and Recommended Disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommended disposition.  A party must file any objections with the Clerk of the United States District Court for the District of New Mexico within the fourteen (14) day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.  Pursuant to Fed. R. Civ. P. 72(b)(2), a party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.**

submitted at the November 7, 2011, evidentiary hearing, relevant law, and the record in this case, the undersigned recommends, for the reasons set forth below, that Defendant's ***Motion to Suppress Evidence and Statements*** *(Doc. 23)* be **GRANTED**.

Defendant contends that all statements and evidence obtained during his stop and arrest must be suppressed because they were elicited or discovered during an encounter that violated his Fourth Amendment rights.  [*Doc. 23* at 5].  Specifically, Defendant argues that (1) the encounter with the agents was not consensual; (2) the encounter, instead, constituted an investigatory detention; and (3) the agents lacked  reasonable suspicion to detain Defendant and, instead, impermissibly stopped him solely due to his Mexican ancestry.  *Id.* at 2-5.  The United States contends that (1) the encounter was consensual and, therefore, did not implicate Defendant's Fourth Amendment rights because Defendant was a willing participant, and a reasonable person in his position would have felt free to walk away at any point prior to his arrest; and (2) even if the encounter did constitute a non-consensual investigatory detention, it still did not violate Defendant's rights because the agents had reasonable suspicion of criminal activity to detain him.  [*Doc. 24* at 2-11].

## I.  PROPOSED FINDINGS OF FACT

At the November 7, 2011, hearing on the motion to suppress, the United States presented the testimony of two Border Patrol agents who were present and participated in the August 1, 2011, stop and arrest of Defendant.  [*Doc. 39* at 5-73 and 90-91].  In addition, Defendant testified on his own behalf at the hearing.  *Id.* at 74-87.  The Court found the testifying witnesses credible, except where indicated below.  The Court admitted two versions of a video recording of the encounter, one submitted by the United States (*Government's Exhibit 1*), and one submitted by Defendant (*Defendant's Exhibit B*), as well as a printout from each video (*Government's Exhibit 2* and

*Defendant's Exhibit C*).  *See* [*Doc. 39* at 10, 35, 40, 54 and 55] (Exhibits 1 and B are lodged with the Clerk of the Court in the United States District Court in Las Cruces, N.M., and copies of Exhibits 2 and C are at *Doc. 46-1* and *46-2*, respectively).

On August 1, 2011, Border Patrol Agents Christopher Myers and Haroldo Amorim were conducting "field intelligence" in Mesquite, New Mexico.  [*Doc. 39* at 6-7].  According to Agent Myers, "field intelligence" involves agents talking to different people to "ask about alien stash houses, gang activity involving drugs and illegal aliens."  *Id.* at 6.  The agents were in plain clothes and driving an unmarked vehicle. *Id.* at 17, 19-20, 23, 59 and 81.  The agents' weapons were not in plain view, but were under the agents' shirts, and the outline of Agent Amorim's weapon was visible; however, Defendant did not see the gun.  *Id.* at 17, 59-60, 68-69 and 81.  Each agent testified that he was the passenger in the vehicle.  *Id.* at 39 and 64.

Around 3:00 p.m. on August 1, 2011, Agents Myers and Amorim were passing the Mesquite Mercantile and observed two men walking into the store with tattoos, goatees, saggy shorts and a jersey uniform shirt.  *Id.* at 8-9.  The agents decided to talk to them about some gang activity in the area.  *Id.* at 9.  The agents parked on the side of the store along Highway 478, facing the parking lot of the Mercantile.  *Id.* at 9 and 39; *see also Government's Exhibit 2* and *Defendant's Exhibit C* at *Doc. 46-1* and *46-2*.  When the two men came out of the store, the agents spoke with them about where they lived and about another gang member, but the agents were not gathering any intelligence from the subjects, so the agents ended the conversation.  [*Doc. 39* at 9].

Agent Myers testified that he saw Defendant and another man (hereinafter "the driver") coming out of the Mercantile carrying a 30-pack of Budweiser beer, and that Defendant got into the passenger side, and the driver got into the driver's side, of a black truck.  *Id.* at 9-10.  Agent Myers testified that he observed that Defendant "was covered in alfalfa," and thought that Defendant might

work at either the dairies or in the fields, so Agent Myers decided that he wanted to ask him questions about illegal activity at his place of employment. *Id.* at 13-14 and 44. Agent Amorim testified, however, that he and Agent Myers saw Defendant and the driver driving <u>into</u> the Mercantile and parking, and that this is when the agents decided to talk to them. *Id.* at 65. Agent Amorim testified that he noticed that Defendant and the driver looked to be Hispanic, but he did not notice anything else about them. *Id.* at 66. Agent Amorim also testified that he and Agent Myers "were talking to everybody in the area," and that he "was just talking to everybody." *Id.* at 65-66.

As the driver was backing the truck out of the space, Agents Myers and Amorim walked quickly towards the truck and Agent Myers raised his arm twice about halfway up with his palm flat and facing toward the truck, indicating that he wanted the driver to stop. *Id.* at 13, 44-46, 76-78, and 91. Defendant testified that he tried to roll up his window, but Agent Myers testified that he did not see Defendant do this. *Id.* at 77 and 91. Agents Myers and Amorim approached the passenger side of the truck, with Agent Myers in front of Agent Amorim, and both agents stood next to the front passenger door and looked in the front passenger window. *Id.* at 14 and 79-80; *see also Government's Exhibit 1* and *Defendant's Exhibit B*. In English, Agent Myers said hello and asked Defendant either where he worked or where he was going. [*Doc. 39* at 14]. Defendant responded that he did not speak English, so Agent Myers asked him in Spanish where he worked and where he was from. *Id.* at 14-15. Defendant responded in Spanish that he was heading to work and was from California. *Id.* at 15. During this conversation, Agent Myers placed his arm on the door of the truck and leaned into the truck. *Id.* at 48 and 79. Agent Amorim's hand was also placed on the truck during this conversation. *Id.* at 67-68.

Agent Myers then raised his shirt to show Defendant his badge, and asked Defendant if he was a United States citizen. *Id.* at 15-16. Defendant told Agent Myers that he was not a

United States citizen and that he was waiting for a petition that was pending.  *Id.* at 16 and 50.

Agent Myers told Defendant that he would have to check Defendant's immigration status and asked

Defendant to get out of the truck, and Defendant did so.  *Id.* at 18.  Defendant considered this

request as an order because it came from an officer.  *Id.* at 84.  During this conversation,

Agent Amorim walked to the driver's side of the vehicle and spoke with the driver.  *Id.* at 15 and 71.

Agent Myers and Defendant walked to the agents' vehicle and Agent Myers gathered

information about Defendant and called sector radio to see if Defendant had immigration paperwork

pending or any immigration arrests.  *Id.* at 20.  While Agent Myers was on the initial call,

Agent Myers observed Defendant becoming "fidgety."  *Id.*  He testified that he was afraid that

Defendant might try to flee and then the agents would "have to get into a pursuit," so Agent Myers

asked Defendant if he wanted to sit in the car as a precautionary measure, and Defendant agreed to

do so.  *Id.*  While waiting to hear back from sector radio, Defendant asked if he could call his

brother, and Agent Myers called Agent Amorim over so Defendant could use the driver's phone to

call his brother.  *Id.* at 21.  The information from sector advised that Defendant did not have a status

that allowed him to be in the United States legally, so Agent Myers placed Defendant under arrest.

*Id.* at 21-22.

During this time, Agent Amorim asked the driver if he was a United States citizen and the

driver said "yes" and provided Agent Amorim proof of his citizenship.  *Id.* at 71.  Agent Amorim

did not ask the driver any further questions about immigration or the community.  *Id.* at 71-72.  At

the time of the encounter, there were vehicles coming in and out of the area and people walking in

and out of the store.  *Id.* at 16, 61-62, 70-71 and 81.  None of these people were approached or

questioned by the agents even though Agent Amorim said they were speaking to "everybody."  *See*

*Government's Exhibit 1* and *Defendant's Exhibit B*.  In fact, the video shows a person getting into

a vehicle next to the agents' vehicle as the agents were walking toward the truck in which Defendant was a passenger. The agents could have easily questioned this person for "field intelligence" but they appeared to be focused instead on Defendant. *Id.*

Neither of the agents touched Defendant until the time he was arrested. *Id.* at 23, 56 and 62-64. The agents did not observe that Defendant or the driver had any tattoos or guns, that they were acting suspiciously, that they were causing trouble at the store, or were engaged in any criminal activity. *Id.* at 51-52 and 66-67. The agents did not tell Defendant that he had the right to terminate the encounter or that he could leave. *Id.* at 52 and 79. The agents testified that Defendant did not tell either of the agents that he wanted to terminate the encounter (*id.* at 24, 55 and 63), but Defendant testified that he asked Agent Myers if he could leave, but Agent Myers told him not until he was sure that Defendant was in the country legally (*id.* at 79 and 83). Agent Myers testified that the encounter between the agents and Defendant took approximately ten to fifteen minutes (*id.* at 55), and Defendant testified that he thought it took longer than 15 minutes, but he did not specify how much longer (*id.* at 85).

## II. PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Therefore, a person is seized within the meaning of the Fourth Amendment "when a reasonable person would have believed that he was not free to leave." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1202-03 (10th Cir. 2006) (citation and internal quotation marks omitted). The Tenth Circuit has identified three general categories of encounters between police and citizens:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

*U.S. v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010) (citing *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006)).   The parties dispute whether the events leading up to Defendant's arrest constitute a consensual encounter or an investigative detention.

## A.   Whether the Encounter was Consensual

It is the Government's burden to prove that the encounter was consensual.  *United States v. Ringold*, 335 F.3d 1168, 1171 (10th Cir. 2003).  Officers "may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures."  *See  U.S. v. Esparza-Mendoza*, 386 F.3d 953, 958 (10th Cir. 2004) (citation and internal quotation marks omitted).  However, a person has been seized if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.  *Fox*, 600 F.3d at 1258.  "The critical inquiry is whether the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  *Id.* (citation, internal quotation marks and brackets omitted).  "To constitute a seizure, an encounter between an officer and a citizen must involve  the use of physical force or a show of authority on the part of the officer such that a reasonable person would not feel free to decline the officer's requests or terminate the encounter."  *Lopez*, 443 F.3d at 1283 (citation omitted).  Also, "it is settled that the nature of the police-citizen encounter can change -- what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa."  *Id.* at 1284 (citation and internal quotation marks omitted).

The Tenth Circuit has enumerated a list of factors to be considered in determining whether a police-citizen encounter amounts to a seizure:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of a person's personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*Fox*, 600 F.3d at 1258 (citation omitted). "No single factor is dispositive, and this list is not exhaustive." *Id.* (citation omitted). "Another relevant factor that suggests an encounter is not consensual is whether the officer advised an individual that [he] is free to leave." *Id.* (citation omitted). "Although no single factor is dispositive, the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (citation and internal quotation marks omitted). The Court should also consider whether an officer made a "coercive show of authority," and both leaning on a citizen's car and the involvement of more than one officer can demonstrate a coercive show of authority. *See, e.g., U.S. v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997); *but see U.S. v. Thompson*, 546 F.3d 1223, 1227 (10th Cir. 2008) (finding the encounter consensual even though the four officers on the scene were uniformed and officer did not advise defendant that he was free to leave, where encounter occurred in view of other patrons, officer did not touch defendant until after he stated that he had gun, only one of the officers approached defendant, and officer did not use antagonistic tone), and *I.N.S. v. Delgado*, 466 U.S. 210, 216-18 (1984) (holding the encounter was consensual where armed INS agents entered a factory, guarded the doors, and systematically questioned workers about their immigration status while displaying their badges).

-8-

The Court finds that the encounter between Defendant and the agents was not consensual because the agents demonstrated a coercive show of authority by walking quickly to the truck in which Defendant was a passenger, and which was in the process of backing out of the parking space; Agent Myers raising his arm twice in a gesture indicating he wanted the truck to stop; both agents leaning on the passenger side of the truck, and Agent Myers placing his arm on the passenger's windowsill; and Agent Myers putting his head into the truck and looking around the truck. These actions created a threatening presence that would make a reasonable person not feel free to terminate the encounter or leave. *See Elliott*, 107 F.3d at 814 (explaining that leaning on a car can indicate a coercive show of authority). While the agents testified that they wanted to question both Defendant and the driver, both agents instead went straight to the passenger side of the truck and did not question the driver until after Defendant had been asked to get out of the truck and go the agents' vehicle. [*Doc. 39* at 13-14, 43-44 and 64-65]. Also, despite testimony that the agents were talking to "everybody," it is clear from the video that the agents walked past another person in the parking lot to get to Defendant. *See id.* at 65-66 and *Government's Exhibit 1* and *Defendant's Exhibit B*. It, therefore, appears that the agents were targeting Defendant, which further indicates a coercive show of authority. In addition, Defendant was unable to exit the vehicle because both agents were blocking his door, and, since he was not driving the truck, he could not drive away. Because the agents were leaning on the window of the truck, it would have been unsafe for the driver to drive away. A reasonable person, therefore, would not have felt free to leave. The Court further finds that, once Agent Myers showed his badge and asked Defendant whether he was a United States citizen, the situation became even more clearly non-consensual.

Moreover, the fact that Defendant and the driver were stopped while they were in a moving vehicle that was attempting to leave the parking lot, demonstrates a coercive show of authority. *See*

*United States v. Mendenhall*, 446 U.S. 544, 556-57 (1980) ("[S]topping or diverting an automobile in transit, with the attendant opportunity for a visual inspection of areas of the passenger compartment not otherwise observable, is materially more intrusive than a question put to a passing pedestrian."); *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (explaining that, except where officers come upon an already parked car, "police interrogation of automobile occupants typically involves a greater degree of intrusiveness than questioning of pedestrians and thus more readily impinges on the Fourth Amendment") (citing *Mendenhall*, 446 U.S. at 556-57). *Cf. Carter v. Ward*, No. 02-6235, 56 Fed. Appx. 911, 912-13, 2003 WL 734229 (10th Cir. March 5, 2003) (unpublished) (finding that an encounter was consensual based on "the essential fact that the police did not 'stop' him," but rather that the driver stopped and parked his car in a parking lot and then spoke with officers); *United States v. Sargent*, No. 97-3331, 153 F.3d 729, 1998 WL 454116, *1 (10th Cir. July 28, 1998) (unpublished) (finding that encounter began as consensual where officers did not stop vehicle but driver parked his vehicle and was entering a restaurant when officer began questioning him).

Here, Defendant and the driver were backing out of a parking space and attempting to leave the parking lot when they were stopped. They were not walking toward the store or toward their vehicle, nor were they in a parked vehicle at the time of the stop. Thus, the stop was even more obtrusive than had they been stopped when they were outside of the truck. If the driver had decided to terminate the encounter and drive away, one or both of the agents could have been injured since the agents were leaning on and into the car. Furthermore, as stated above, Defendant was unable to exit the truck to walk away from the agents because both of the agents were leaning on the window of the door, thus making it impossible for him to leave. The Court, therefore, finds that the encounter between the agents and Defendant was not consensual at least from the point when the

agents leaned on the truck and Agent Myers put his head in the passenger window, because a reasonable person would not have believed he was free to leave.  When Agent Myers showed his badge and asked Defendant whether he was a United States citizen, the facts moved even more clearly into a non-consensual encounter when considered along with the evidence that Agents Myers and Amorim were leaning on and touching the truck and passenger-side windowsill, and Agent Myers put his head into the cab of the truck.

The Court finds that the encounter here is distinguishable from those in *United States v. Thompson*, 546 F. 3d 1223 (10th Cir. 2008) and *United States v. Ringold*, 335 F.3d 1168 (10th Cir. 2003).  In *Thompson*, an officer in uniform approached Mr. Thompson in a parking lot of a convenience store and asked him if he had anything illegal on him.  546 F.3d at 1225. Mr. Thompson became nervous and did not answer at first, but the officer told him to relax, repeated the question, and Mr. Thompson told the officer he had a gun in his back pocket.  *Id.*  The Tenth Circuit affirmed the district court's holding that the encounter was consensual because the encounter occurred in a public place in view of other patrons, the officer did not touch or threaten Mr. Thompson and did not display his weapon, and only one officer approached Mr. Thompson. *Id.*  The Tenth Circuit said that the officer's tone in asking questions was not antagonistic, which indicated a lack of coerciveness.  *Id.* at 1228.  Significantly, the Tenth Circuit found that Mr. Thompson was not impeded by the officer from walking away.  *Id.* at 1229.  In *Ringold*, two officers exited their patrol car at a gas station and convenience store and approached Mr. Ringold, who was outside of his vehicle as well.  335 F.3d at 1170.  The officer engaged Mr. Ringold in conversation and asked him if he could look inside the car, and Mr. Ringold said he could.  *Id.* at 1171.  The officer then asked Mr. Ringold if he could open the suitcases he saw in the vehicle and Mr. Ringold said he could, wherein the officer found drugs.  *Id.*  The Tenth Circuit held that the

encounter between the officer and Mr. Ringold was consensual because Mr. Ringold's vehicle was already stopped when he was approached, neither officer touched or brandished his weapon during the encounter, the patrol car was not blocking Mr. Ringold or the vehicle from leaving, and the officer was polite and the conversation was friendly in tone. *Id.* at 1172.

In contrast to those cases, here, Defendant was in a vehicle that was attempting to drive away when he was stopped and questioned. Unlike Mr. Thompson or Mr. Ringold, Defendant could not walk away from the encounter because that would have required him to open the door of the truck, against which both officers were leaning. In addition, in both *Thompson* and *Ringold*, the officers approached the defendants while the defendants were already outside of their vehicles and not trying to leave from the areas. Here, Defendant and the driver were attempting to drive away and were unable to do so once the agents placed their arms on the truck and Agent Myers leaned into the truck. For the foregoing reasons, the Court concludes that the encounter was not consensual.

## B. Whether the Agents had Reasonable Suspicion to Detain Defendant

Because the Court has found that the encounter was not consensual, it must now determine whether the agents had reasonable suspicion to detain Defendant. "In analyzing the constitutionality of a detention under the Fourth Amendment, the Court must apply the 'reasonable suspicion' standard for investigative detentions originally set forth in *Terry v. Ohio*[, 392 U.S. 1, (1968)]." *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (citation omitted). "To justify a *Terry* stop, the detaining officer must have, based on all the circumstances, a 'particularized and objective basis for suspecting' the person stopped of 'criminal activity.'" *Id.* (citation and internal quotation marks omitted). The first question under *Terry* is whether the stop was "justified at its inception." *Id.* (citation omitted). "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective

justification' for making the stop." *Id.* at 1134 (citation omitted). "Evidence falling 'considerably short' of a preponderance satisfies this standard." *Id.* (citation omitted). In addition, "[t]he likelihood that any given  person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975).

There are additional, non-exclusive, factors to consider when determining whether there was reasonable suspicion to stop a car in the border area. These factors are:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Cheromiah*, 455 F.3d 1216, 1220-21 (10th Cir. 2006) (citations omitted).

The United States contends that "Agent Myers had reasonable suspicion to detain Defendant once he learned he was not a United States citizen, he had no papers to allow him to be in the United States legally, and he could not speak any English." [*Doc. 44* at 11]; *see also* [*Doc. 24* at 10]. It is not clear if Agent Myers learned that Defendant had no papers allowing him to be in the United States legally while Defendant was still in the truck, or after Defendant had followed the agent to the agent's vehicle. Agent Myers testified that he told Defendant that he would have to check Defendant's immigration status after Defendant told him his petition was pending, but Agent Myers did not testify that he asked to see a copy of the petition or any other type of proof of Defendant's immigration status. [*Doc. 39* at 18]. While Defendant testified that Agent Myers asked to see proof that he was in the country legally, it is unclear from Defendant's testimony when Agent Myers asked for this proof. *See* [*Doc. 39* at 78-79]. Regardless, the Court has found that

Agent Myers detained Defendant at least from the point when the agents leaned on the truck and Agent Myers put his head in the passenger window, making it impossible for Defendant to leave, which was prior to the time Agent Myers learned that Defendant was not a United States citizen. Because the detention must be justified at its inception, the fact that Agent Myers learned that Defendant was not a United States citizen and did not have papers with him after Defendant was already detained does not justify the detention of Defendant.

The United States also contends that the agents' decision to detain Defendant was further supported by the fact that the stop took place "in an area with a high volume of illegal aliens." [*Doc. 24* at 10] and [*Doc. 44* at 11]. The United States presented no evidence to support this contention, and the agents did not testify that the volume of illegal aliens in the area was a factor they considered in stopping Defendant, or that they wanted to question Defendant because they thought he was an alien. The United States does not cite to any authority or to the transcript to support this contention, and the Court, therefore, finds that the location of the stop does not support a finding of reasonable suspicion to detain Defendant.

The United States sets forth no argument that the agents had reasonable suspicion to detain Defendant prior to learning that he was not a United States citizen and did not have papers with him. Although Agent Myers testified that he decided to talk to Defendant after he observed that Defendant's clothing had alfalfa on it [*Doc. 39* at 13-14 and 44], the Court finds that this observation does not constitute reasonable suspicion that criminal activity was afoot. *See also id.* at 51-52 and 66-67 (testimony of agents that they did not observe or suspect any criminal activity by Defendant or the driver before approaching them). When the agents stopped Defendant and the driver, it was based on seeing alfalfa on their clothes and because they were Hispanic. [*Doc. 39* at 13-24, 44-45, 64-65]. The agents then proceeded to lean on and into the truck, and learned that

-14-

Defendant did not speak English. *Id.* at 14-15. None of these observations constitute reasonable suspicion to detain Defendant, yet the Court has found that Defendant was detained at this point. Moreover, after learning that Defendant did not speak English, Agent Myers showed Defendant his badge, which is a further coercive show of authority but was not based on any additional evidence of reasonable suspicion that a crime was afoot, because the inability to speak English is not a crime. After showing Defendant his badge, Agent Myers learned that Defendant was not a United States citizen; however, this information was learned after Defendant had already been detained, and, thus, cannot be used to justify the earlier detention. *See Brignoni-Ponce*, 422 U.S. at 884 ("For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."). The Court, therefore, concludes that the agents did not have reasonable suspicion to detain Defendant and the detention violated Defendant's Fourth Amendment rights.

### III.  Conclusion

Based on the foregoing, the Court finds that the encounter between Defendant and the agents was not consensual and that the agents did not have reasonable suspicion to detain Defendant at the inception of the stop. The Court, therefore, recommends that Defendant's ***Motion to Suppress Evidence and Statements (Doc. 23)*** be **GRANTED**.

### <u>RECOMMENDED DISPOSITION</u>

The Court recommends that Defendant's ***Motion to Suppress Evidence and Statements (Doc. 23)*** be **GRANTED**.

*Lourdes a. Martinez*
_____
**HONORABLE LOURDES A. MARTÍNEZ**
**United States Magistrate Judge**

-15-